# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS – COMMERCIAL DIVISION
------------------------------------------------------------------X

STAR AUTO SALES OF QUEENS LLC                    Index No.: 717443/2017
D/B/A STAR SUBARU,

                                                 HON. MARGUERITE A. GRAYS
                                    Plaintiff,

        -against-

DOUGLAS FILARDO and                              AFFIDAVIT OF JACQUELINE
SUBARU MOTORSPORTS D/B/A                          CUTILLO IN SUPPORT OF
MOTORSPORTS ADVERTISNG,                           DAMAGES FOR INQUEST

                                    Defendants.
------------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

I, Jacqueline Cutillo being duly sworn, depose and say the following:

    1.    I am the office manager for Plaintiff, Star Auto Sales of Queens LLC d/b/a Star

Subaru ("Plaintiff" or "Star Subaru"). I am also a Certified Fraud Examiner ("CFE"). I have been

the office manager at Star Subaru since April of 2017. Prior to that I was a biller at Star Subaru.

Therefore, I have personal knowledge of the contents of this affidavit.

    2.    This affidavit is based upon my personal knowledge, a review of the records

maintained in the ordinary course of business at Star Subaru, and information I have received from

Plaintiff's counsel.

    3.    I submit this affidavit in support of Plaintiff's proof of damages for the inquest on

damages that is being held by this court on September 27, 2021 (hereinafter the "Inquest").

    4.    Plaintiff's damages resulting from the claims asserted in its Amended Verified

Complaint amount to $8,499,924.40, which is broken down as follows:

| TOTAL DAMAGES | |
|---|---|
| **CATEGORY OF DAMAGES** | **AMOUNT** |
| 1. COMPENSATION PAID TO FILARDO BY PLAINTIFF | $ 1,701,892.49 |
| 2. ADVERTISING MONEY DEFENDANTS STOLE FROM PLAINTIFF | $ 1,419,874.83 |
| 3. FILARDO'S THEFT OF CASH FROM STAR SUBARU CUSTOMERS | $ 378,157.08 |
| 4. PUNITIVE DAMAGES | $ 5,000,000.00 |
| **TOTAL** | **$ 8,499,924.40** |

| COMPENSATION PAID TO FILARDO BY PLAINTIFF (breakdown of 1 above) | |
|---|---|
| **TIME PERIOD** | **AMOUNT** |
| NOVEMBER 25, 2008 to DECEMBER 14, 2014 | $ 1,151,165.63 |
| DECEMBER 14, 2014 to DECEMBER 1, 2017 | $ 550,726.86 |
| **TOTAL** | **$ 1,701,892.49** |

| ADVERTISING MONEY DEFENDANTS STOLE FROM PLAINTIFF (breakdown of 2 above) | |
|---|---|
| **TIME PERIOD** | **AMOUNT** |
| NOVEMBER 25, 2008 to DECEMBER 31, 2009 | $ 106,758.50 |
| JANUARY 1, 2010 to DECEMBER 31, 2010 | $ 162,988.00 |
| JANUARY 1, 2011 to MARCH 31, 2011 | $ 33,772.50 |
| APRIL 1, 2011 to DECEMBER 31, 2011 | $ 171,390.00 |
| JANUARY 1, 2012 to DECEMBER 14, 2014 | $ 686,045.83 |
| DECEMBER 15, 2014 to DECEMBER 15, 2017 | $ 258,920.00 |
| **TOTAL** | **$ 1,419,874.83** |

| FILARDO'S THEFT OF CASH FROM STAR SUBARU CUSTOMERS (breakdown of 3 above) | | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **TOTAL** |
| MONEY APPLIED TO FAKE CLAIMS (AMOUNT STOLEN) | $ 9,939.12 | $ 115,127.21 | $ 124,831.56 | $ 128,259.19 | **$ 378,157.08** |

## PROOF OF DAMAGES

### A. Filardo's Compensation from Plaintiff

5.      From Filardo's first act of disloyalty on November 25, 2008 through December 14, 2014, Plaintiff paid Filardo $1,151,165.63 in compensation. See **Exhibit "1"** (ADP Master Control and ADP Employee Earnings Reports).[1]

6.      From December 15, 2014 to December 1, 2017, Plaintiff paid Filardo $550,729.86. Id.

7.      Accordingly, judgment should be entered against Defendants in the amount of $1,701,892.49 representing all compensation Plaintiff paid to Filardo during his disloyalty.

### B. Advertising Money Defendants Stole From Plaintiff

8.      Filardo, as Plaintiff's sales manager, was responsible for hiring advertising vendors. See NYSCEF Docket Entry No. 5 ¶¶ 15, 35.

9.      Unbeknownst to Star Subaru, from November 25, 2008 through November 1, 2016, Filardo operated a sole proprietorship, Motorsports Advertising, under the alias surname "FILATDO", solely for the purpose of receiving ill-obtained payments from Star Subaru. See NYSCEF Docket Entry No. 5 ¶ 33, **Exhibit "2"** (Motorsports Advertising's Business Certificate).

10.     Filardo opened a bank account for Motorsports Advertising with JP Morgan Chase ("Chase"). See **Exhibit "3"** (Chase Bank Account Records).

---

[1] Filardo was paid $127,735.08 in 2008. Because his first act of disloyalty occurred on November 25, 2008, to calculate damages for 2008, Plaintiff divided $127,735.08 by 365 (days) and multiplied this number by 39 (the number of days that he was paid in 2018 during his period of disloyalty), which equals $13,993.59. Plaintiff was unable to find the ADP Master Control report for Filardo in 2014 so it has included copies of the ADP Employee Earnings Report from 2011 to 2017 to show that the year end gross pay for each year in the ADP Employee Earnings Report matches the year end gross pay in the ADP Master Control report.

11.     During Filardo's employment with Star Subaru, Star Subaru was not aware that Motorsports Advertising was Filardo's sole proprietorship.

12.     During Filardo's employment with Star Subaru, Plaintiff was under the impression that it was receiving advertising services from Motorsports Advertising. However, Motorsports Advertising provided no advertising to Star Subaru. In fact, Motorsports Advertising was not an advertising business. **Exhibit "4"** (Filardo Deposition Transcript, March 2, 2021) at 12:25-13:3.

13.     The mailers that Plaintiff received from Motorsports Advertising were merely samples that were never actually mailed out to potential customers.

14.     Defendants did not even create the fake mailing samples. Instead, they hired New Vision Advertising to make them and used the invoices New Vision Advertising issued Motorsports Advertising as templates for the fake invoices Filardo created and provided to Plaintiff on behalf of Motorsports Advertising.

15.     Filardo hand delivered these fake invoices to Star Subaru's office employees. See NYSCEF Docket Entry No. 5 ¶ 37. Star Subaru paid these invoices by issuing checks to Motorsports Advertising. Id.

16.     Filardo's deposition testimony in <u>Star Auto Sales of Queens LLC v. Hanie Iskander</u> <u>et al.</u>; Case No.: 1:19-cv-06791 (RPK) (ST) (E.D.N.Y.) establishes that Motorsports Advertising provided no advertising services to Plaintiff for the money Star Subaru paid it. Indeed, at his deposition, Filardo repeatedly invoked his Fifth Amendment right against self-incrimination when he was questioned about Motorsports Advertising:

Q.   Mr. Filardo, did you ever open up the business Motorsports Advertising?
A.   I am going to take the 5th. I don't know why it is related. I take the 5th.
Q.   Was there an office from where Motorsports Advertising was run?
A.   Take the 5th.
Q.   Did Motorsports Advertising have a phone number?
A.   Take the 5th. I don't know. You are asking me questions that I don't remember.

Q. You are saying that you take the 5th and then you don't remember, so which one is it?

**Exhibit "4"** (Filardo Deposition Transcript, March 2, 2021) at 58:11-23.

Q. Did Motorsports Advertising have an email address?
A. Take the 5th. I don't know.
Q. Did Motorsports Advertising have a tax ID number?
A. I believe so. I'm not going to answer these questions. I'm taking the 5th on it. Could I just let my dog in? Give me two seconds to open the door.
Q. To be clear, on the last question about whether Motorsports Advertising had a TIN number, are you pleading the 5th?
Q. Yes.
THE REPORTER: Did you say a TIN number?
Q. TIN number, tax identification number.
A. Yes.
Q. What type of corporate entity was Motorsports Advertising?
A. I take the 5th. I don't know.
Q. Does Motorsports Advertising exist currently?
A. No. Take the 5th.
Q. When was Motorsports Advertising created?
A. Take the 5th.
Q. Who created Motorsports Advertising
A. Take the 5th.
Q. Motorsports Advertising was created to receive ill-obtained payments from Star Subaru for purported work done by New Vision from 2008 through December 2016, correct?
A. Take the 5th.
Q. Who operated Motorsports Advertising?
A. Take the 5th.

**Exhibit "4"** (Filardo Deposition Transcript, March 2, 2021) at 59:6-60:15.

Q. What kind of business was Motorsports Advertising engaged in?
A. Take the 5th.
Q. Are you an advertising agent?
A. No.
Q. Star Subaru was the only customer of Motorsports Advertising, correct?
A. Take the 5th.
Q. When was Subaru Motorsports, doing business as Motorsports Advertising, registered?
A. Take the 5th.
Q. Who deposited the checks that Motorsports Advertising received?
A. I take the 5th.
Q. When did Motorsports Advertising stop doing business with Star Subaru?
A. Take the 5th.
Q. Why did Motorsports Advertising stop doing business with Star Subaru?
A. Take the 5th.
Q. What expenses did Motorsports Advertising incur?

A. Take the 5th.
Q. What other vendors did Motorsports Advertising work with?
A. Take the 5th.
Q. How much income did Motorsports Advertising earn each year?
A. Take the 5th.
Q. Did you report all of the income received by Motorsports Advertising on the tax returns for Motorsports Advertising?
A. Take the 5th.

**Exhibit "4"** (Filardo Deposition Transcript, March 2, 2021) at 60:22-62:6.

Q. The record reflects that Star Subaru paid Motorsports Advertising $1,419,874.83. Of that amount, Motorsports paid New Vision $453,484.75. Do you have any reason to dispute those numbers?
A. I take the 5th.
Q. Did you ever create invoices on your own?
A. I take the 5th.

**Exhibit "4"** (Filardo Deposition Transcript, March 22, 2021) at 76:7-13.

Q. At your last deposition, on numerous occasions you stated in response to certain questions that you take the 5th and on some occasions you would add some additional information, such as that you are not answering the questions or you're taking the 5th because you believe it is related to another case. Now, when you were taking the 5th at your last deposition, were you doing so because you believed answering each of those questions may incriminate you with respect to a crime?
A. I don't believe I committed a crime, but I believe it could be used to try to be held against me, in addition to -- in the other existing case.
Q. Mr. Filardo, it is a simple yes-or-no answer that is required. I will ask the question again. And I need a yes or no.
A. Yes.
Q. The answer is yes?
A. Yes.

**Exhibit "4"** (Filardo Deposition Transcript, March 22, 2021) at 5:24-6:20.

In fact, Filardo invoked the Fifth Amendment privilege during his deposition at least thirty-seven (37) times. Id.

17. Moreover, John Alexander (a/k/a Hanie Iskander) ("Alexander"), the founder and owner of New Vision Advertising, testified at his deposition in the matter of Star Auto Sales of Queens LLC v. Hanie Iskander et al.; Case No.: 1:19-cv-06791 (RPK) (ST) (E.D.N.Y.), that the

fake Motorsports Advertising invoices, which were created by Filardo (using New Vision Advertising's invoices as a template) and issued to Star Subaru were bogus and not created by New Vision Advertising:

Q. Paragraph 21 [Referencing Exhibit 3 from Deposition], I have no copies or proof of any of the work done. This includes all invoices, mailing receipts, addresses mail orders were sent to, and the mailers sent. Is that accurate?
A. Yes.
Q. Paragraph 22 says, My accountant is deceased and no longer has any of the business records. Is that accurate?
A. Yes.

**Exhibit "5"** (Alexander Deposition Transcript) at 206:4-14.

Q. Paragraph 23, All of the invoices annexed to this declaration in Exhibit A are bogus and were not created by myself or New Vision. Filardo is the only person that could have created them. And then you can scroll through the invoices if you like. Is that accurate, that statement?
A. Yes. I don't recognize anything.

**Exhibit "5"** (Alexander Deposition Transcript) at 206:25-207:9.

Q. When were you first in possession of those invoices?
A. When?
Q. Yes.
A. When we do the work.
Q. What happened to those invoices?
A. What happened to the invoices?
Q. Do you have them right now, the invoices?
A. I don't. Doug Filardo has all of them.
Q. What did you do with them? Why are you no longer in possession of them?
A. Everything is done digitally. I don't have any digital files. Everything is digital. We sent them digital files.
Q. In what manner did you send it to him? Was it through email?
A. Yes.
Q. You don't have any of those emails, right?
A. No.

**Exhibit "5"** (Alexander Deposition Transcript) at 93:10-94:6; <u>see</u> <u>also</u> **Exhibit "6"** (Alexander Declaration).

18. Filardo and Alexander testified they do not have copies or proof of any of the work done, such as invoices, mailing receipts, addresses mail orders were sent to, and the mailers that

were purportedly sent. <u>See</u> **Exhibits 4** (Filardo Deposition Transcript March 22, 2021 at 15:3-16:10), **5** (Alexander's Deposition Transcript at 214:1-23), **6, and "7"** (Filardo and Alexander's Responses to Document Demands).

19.     Filardo and Alexander were unable to provide the name of the company or companies that purportedly mailed the mailers. <u>See</u> **Exhibits 4** (Filardo Deposition Transcript March 22, 2021 at 13:25-14:23), **5** (Alexander's Deposition Transcript at 88:20-90:3).

20.     Alexander testified that invoices with New Vision Advertising's logo and Motorsports Advertising's mailing address were fake and only Filardo could have created them. **Exhibit "5"** (Alexander Deposition Transcript) at 206:25-207:9.  Star Subaru paid these invoices.

21.     Motorsports Advertising gave Plaintiff fake advertising mailers that were never distributed. The marketing production company listed on one of the mailers is "Velaasis", located at 101 Targeting Center, Windsor, Connecticut 06093. <u>See</u> **Exhibit "8"** (Fake Mailer).

22.     However, "Velaasis" located at 101 Targeting Center, Windsor, Connecticut 06093, does not exist.  Notably, Valassis (not Vela<u>a</u>sis), located at 235 Great Pond Drive, Windsor, CT 06095, is a marketing production company used by many auto dealers. Moreover, upon information and belief, an affiliate of Valassis, RedPlum.com, is or was located nearby at "1 Targeting Center", but the fake mailer states that the fake company, Velaasis's, address is "1 Targeting Center, Windsor, CT 06093."

23.     When Filardo had Motorsports Advertising listed as a vendor in Star Subaru's Dealership Management System ("DMS"), he provided Plaintiff with New Vision Advertising's Florida address and New Vision Advertising's Tax Identification Number for Motorsports Advertising.  Filardo did this as a means to disguise and willfully conceal this scheme from Star

Subaru (so that Star Subaru could not figure out that Motorsports Advertising was Filardo's sole proprietorship). See NYSCEF Docket Entry No. 5 ¶ 39.

24. New Vision Advertising's bank records for the period December 21, 2012 to April 6, 2018 contain no transactions evidencing that it provided advertising services. New Vision Advertising's bank records merely show the money in its bank account was used for personal expenses like food, groceries, and gas. Annexed hereto as **Exhibit "9"** is New Vision Advertising's bank records.

25. Likewise, Motorsports Advertising's bank records show no transactions demonstrating that it actually performed any advertising services. Motorsports Advertising's bank records merely show the money in its bank account was used for personal expenses like food, parking, and gas. Annexed as **Exhibit "10"** are Motorsports Advertising's bank records

26. Plaintiff paid Motorsports Advertising $1,419,874.83 for advertising services that it thought Motorsports Advertising was providing to it. **(Annexed as Exhibit "11" are copies of checks issued by Star Subaru to Motorsports Advertising (along with deposit slips) for the period of April 4, 2011 to December 15, 2017). (A spreadsheet I created summarizing each of the checks in Exhibit 11 is annexed hereto as Exhibit "12"). (Annexed as Exhibit "13" is a summary from Plaintiff's DMS of the amount Plaintiff annually paid Motorsports Advertising during the period of November 25, 2008 to March 31, 2011).**[2]

---

[2] Plaintiff does not have copies of the checks it issued to Motorsports Advertising for this period. Plaintiff contacted its bank, Investors Bank, and Motorsports Advertising's bank, Chase, but neither bank had checks for this period as they are outside the scope of their document retention policies.

27.    Based on the foregoing, Plaintiff has been damaged by Defendants in the amount of $1,419,874.83 from this scheme for which a judgment should be entered against Defendants and in Plaintiff's favor.

### C. Filardo's Theft From Star Subaru by Keeping Customer Cash Deposits

28.    From 2014 through 2017, Filardo stole an additional $378,157.08 from Star Subaru by keeping cash deposits given to him by customers. **(Annexed as Exhibit "15" (Reynolds Report) is a report I generated in the DMS which lists all the Subaru vehicle deals (except for one)[3] for which Star Subaru did not receive full payment).[4]**

29.    Star Subaru **never** permits a customer to take a car from the dealership without it being paid in full. Therefore, any vehicle deal listed in Exhibit 15 indicates Filardo stole cash from the customer.

30.    The amount Filardo stole under this scheme on an annual basis is summarized below:

| FILARDO'S THEFT OF CASH FROM STAR SUBARU CUSTOMERS | | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | TOTAL |
| MONEY APPLIED TO FAKE CLAIMS (AMOUNT STOLEN) | $ 9,939.12 | $ 115,127.21 | $ 124,831.56 | $ 128,259.19 | $ 378,157.08 |

---

[3] The one excluded vehicle deal concerns customer Michael Grgas. Annexed as **Exhibit "16"** (Grgas Records) are the documents showing an extremely rare circumstance where the customer, Grgas, purchased a Subaru from a different Subaru dealership (not from Plaintiff) that apparently "stalled" (as described in records). Upon information and belief, Subaru of America gave Grgas a credit of $2,160.00 towards a new car and allowed him to trade in his car that "stalled" for the exact same car (which Star Subaru had in stock). $2,160.00 from the Grgas deal subtracted from the total in **Exhibit 15**, equals $378,157.08.

[4] In **Exhibit 15**, dates in 2018 refer to when Star Subaru discovered money was missing from that particular car purchase (and not when the car purchase occurred).

31.     Filardo used an annual advance payment from Subaru of America, Inc. ("Subaru of America") to cover up the theft of cash from Star Subaru customers from 2014 until July 2017. Filardo kept cash that customers handed to Filardo to pay for deposits towards vehicle purchases instead of remitting the cash payments to Star Subaru. Then, Filardo concealed this theft by lying to Plaintiff's office employee, Gladys Galarza ("Galarza"), that the customers did not pay for their vehicles in full because the customers' vehicles were damaged and Star Subaru would eventually get reimbursed by Subaru of America for the damage. The purported amount of damage to the customers' vehicles was typically the same amount as the customers' cash deposits they handed to Filardo and was typically whole numbers (i.e. no cents). See Id. ¶ 27.

32.     Annexed as **Exhibit "18"** (Fake Claim Forms) are examples of the claim forms created based on Filardo's directive and which were included in many of the deal jackets.

33.     In fact, none of these claims are valid. Customers for whom Filardo created fake claim forms testified at their depositions that they (1) purchased vehicles from Filardo; (2) did not sign the claim forms; (3) there was no damage to their vehicles; and (4) they paid for their vehicles in full. See **Exhibit "20"** (Christina Gomes Deposition Transcript at 8:11-20:6; exhibit 2 to deposition); **Exhibit "21"** (Derrick Arroyave Deposition Transcript at 11:12-16:15; exhibit 2 to deposition); **Exhibit "22"** (Howard Wong Deposition Transcript at 8:13-10:2; 10:12-14; 11:7-12:23; 13:12-20:8; exhibit 2 to deposition); **Exhibit "23"** (Larisa Isakov Deposition Transcript at 10:3-5; 13:2-15; 13:22-14:19; 15:19-22; 17:10-18:3; 18:10-20:25; exhibit 2 to deposition); **Exhibit "24"** (Samantha Walcott Deposition Transcript at 10:12-15:6; 17:16-21:14; exhibit 2 to deposition); **Exhibit "25"** (Wonjung Yun Deposition Transcript at 8:25-9:3; 10:19-15:19; 19:20-20:25; 23:14-26:11; 27:6-10; exhibits to deposition, Declaration, and credit card statements).

34.	Claim forms are used only when there is a public incentive program for customers to receive cash back for purchasing a vehicle. Claim forms are never used when there is damage to a car.

35.	Filardo named one incentive program, "Damage Hood", another "Damage Repaint", and a third "Customer Satisfaction Claim". Id. These incentive programs did not exist and were completely fabricated by Filardo.

36.	For the bogus "Damage Hood" incentive program, the period start date was December 1, 2016 and ended on January 3, 2017. Id.

37.	Galarza was instructed by Filardo to accrue for missing customers' money by making corresponding accounting entries in Star Subaru's DMS. Id. ¶ 4.

38.	In these instances of purported damage to customer vehicles, Filardo typically provided Galarza with a claim form or a claim number, and Galarza would enter such number in Star Subaru's DMS. Id. ¶ 5. No other employees provided Galarza with a claim form or number. Id. ¶ 6.

39.	In some instances, no claim form was placed in a customer's deal jacket.[5] On those occasions, Galarza asked Filardo to provide her with the claim number, but he never did. Id. ¶ 7.

40.	On occasion, Galarza would tell Filardo that the names on the claim form did not match the names of the customers on the deal. In response, Filardo would tell Galarza the individual was a friend or relative and they were paying for the car the customer purchased. Id. ¶ 12.

---

[5] A customer's deal jacket contains all documents related to the sale or lease of a vehicle.

41.     Galarza's declaration details some specific examples of claims about customers she recalls Filardo provided to her for which she made corresponding entries into Plaintiff's DMS using Reynolds and Reynolds Company ("Reynolds") software. Id. ¶¶ 5, 13-32.

42.     As discussed *supra*, Galarza was instructed by Filardo to accrue for this missing customer money in Plaintiff's DMS. Id. ¶ 4.

43.     Annexed as **Exhibit "17"** (Reynolds Entries by Gladys) is a summary of the customer deals/fake claims that were relieved (i.e. settled) by the Subaru of America bonus money Star Subaru received in 2015, 2016, and 2017.[6] Also included in **Exhibit 17** are the underlying manual entries Galarza was directed to make in Reynolds to cover up the debt from these false claims (unbeknownst to Galarza) with the Subaru of America bonus money. Even though there are phony customer claim forms in most of the applicable deal jackets, these manual entries made by Galarza show the bonus money was also applied to deals with no claim forms.

44.     Page 1 of Exhibit 17 itemizes the deposit amount of $137,762.10 paid to Star Subaru by Subaru of America on February 18, 2015. Line 1 of this document indicates a $5,000.00 deposit being credited to Control # S14-1025. This control number is an identifying number specific to a particular vehicle purchased and is also known as a "stock number". The description for Line 1 is "DAMAGE CAR/PYC". "Pyc" is the last name of the customer that purchased stock # S14-1025. The same explanation applies to line 2 of this document; the last name of the customer in line 2 is Duphan.

---

[6] **Exhibits 15** and **17** reflect that only a portion of the money owed for customer deals for Debra Michlewitz ($3,997.50 of $5,000.00) and Paul Tremblay ($4,893.31 of $5,000.00) was relieved by the bonus money Star Subaru received in 2017. However, the remaining amounts for each of these deals were stolen by Filardo as they are still outstanding on Plaintiff's accounts receivable schedule (as of today).

45.     Lines 3-6 of page 1 of Exhibit 17 also identify specific controls number, but unlike lines 1 and 2, the control numbers in lines 3-6 do not represent a stock number, but rather, they represent identifying customer numbers related to the purchases of vehicles from Star Subaru. For example, control number 15935 corresponds to a customer with the last name Wan and control number 15995 corresponds to a customer with the last name Berk.

46.     Page 2 of Exhibit 17 consists of a report called "we owes on deliveries" which is used to track the sales of vehicles sold by Star Subaru requiring installation of alarms, vin-etch and auto starts. Towards the bottom of this report (5th row from the bottom) is stock number S14-1025 which is the same stock number that is found on page 1 of Exhibit 17, and which shows at the time of purchase on July 14, 2014, an entry for $5,000.00 entitled "SUBARU TO PAID DAMAGE" was set up as a receivable waiting for payment to be issued to Star Subaru by Subaru of America. In addition, on February 18, 2015, a credit of $5,000.00 was applied to this same stock number (S14-1025) for "DAMAGE CAR/PYC". The credit being applied to the outstanding balance owed on the "we owes on deliveries" report is the individual transaction connected to page 1 of Exhibit 17 which concerns the payment from Subaru of America. The payment by Subaru of America broken down one by one to each applicable stock number (lines 1 and 2) is identified using the ""we owes on deliveries" report as stated above. These payments were never supposed to be applied to these random vehicles purchased, and therefore, these funds were in fact stolen.

47.     Critically, at no time should an outstanding balance for cash on delivery (COD) not be completely paid in full prior to obtaining the vehicle purchased.

48.     Page 3 of Exhibit 17 reflects the same data as above, but for stock number s15-88 which is identified on page 1 of this exhibit.

49.     The remaining pages in Exhibit 17 contain the additional data that corresponds to the setup of the "claim" and the payment applied to each outstanding "claim" as well as other payments for other years with corresponding data.

**Filardo's Cover Up of This Scheme**

50.     Filardo used an annual advance payment from Subaru of America to cover up his above-described theft of cash from Star Subaru customers. See <u>NYSCEF Docket Entry No. 5</u> ¶ 22.

51.     From 2015 through 2018, Subaru of America issued annual lump sum advance payments to Subaru dealerships, including Star Subaru, as part of a national bonus program for selling customers extended warranties on vehicles they purchased. Annexed hereto as **Exhibit "19"** (Subaru of America Bonus Money Backup) are records from Reynolds showing Star Subaru received the following lump sum amounts from Subaru of America during each of these years[7]:

|  | 2015 BONUS | 2016 BONUS | 2017 BONUS | 2018 BONUS | TOTAL |
|---|---|---|---|---|---|
| MONEY FROM SUBARU OF AMERICA TO STAR | $ 137,762.10 | $ 131,000.10 | $ 130,330.20 | $ 155,241.60 | $ 554,334.00 |

<u>See</u> <u>NYSCEF Docket Entry No. 5</u> ¶ 23.

52.     This bonus program had no connection whatsoever to any purported claims by Star Subaru against Subaru of America. <u>See</u> **Exhibit "14"** ¶ 33.   Nevertheless, when the bonus payments were received by Star Subaru, Galarza was instructed by Filardo to record and deposit the payments Star Subaru received from Subaru of America as accounts receivables for payments for the nonexistent claims manufactured by Filardo. <u>Id.</u>

53.     Filardo used these bonus payments from Subaru of America to cover up the cash down payments that customers gave to him. <u>Id.</u> ¶ 34.

---

[7] Also included in **Exhibit 19** are copies of Star Subaru's bank statements for the months when Star Subaru received these bonuses showing the actual deposits.

54.    The claims referred to in ¶ 41 above are examples of claims that were made to hide these bonus payments. See Id. ¶ 35.

55.    Filardo deceived Galarza by telling her that Star Subaru would eventually get reimbursed by Subaru of America for these claim amounts. Id. ¶ 37.

56.    Since Filardo was aware that this bonus money was paid by Subaru of America in the first quarter of each year and was able to estimate the amount of the bonus (since he knew how many extended warranties Star Subaru needed to sell in order to keep the full bonus amount), during each year (ex. 2015) he would have Galarza add these claims to the accounts receivables schedule. Once Star Subaru received the new bonus money during the first quarter of the following year (ex. 2016), he would instruct Galarza to relieve (i.e. settle) and cover up the debt from the false claims (ex. false claims from 2015).

57.    Notably, this bonus money from Subaru of America was for a bonus program, not an incentive program. Incentive programs provide customers with a discount that ranges from $500.00 to the absolute maximum of $1,500.00. Here, only four (4) of the sixty-seven (67) customer deals involve an amount of $1,500.00 or less.

58.    I independently reviewed each of these customer deals in Reynolds and confirmed that none of these customer deals involved an incentive program.

59.    Based on the foregoing, Plaintiff has been damaged by Defendants in the amount of $378,157.08 from this scheme for which a judgment should be entered against Defendants and in Plaintiff's favor.

I declare under the penalty of perjury that the foregoing is true and correct.

Jacqueline Cutillo

Sworn to before me this
21th day of September, 2021

16

_Amanda Grassi_

NOTARY PUBLIC

AMANDA GRASSI
Notary Public, State of New York
Registration #01GR6198145
Qualified In Nassau County
Commission Expires Dec. 15, 2020 2024

# EXHIBIT "1"

**FILARDO, DOUGLAS**
1003 CEDAR SWAMP RD
BROOKVILLE, NY 11543

| | |
|---|---|
| File: 000653 | Status: ACTIVE |
| Dept: 100 | Sex: M |
| Clock: XN59B | |
| SSN: XXX-XX-6084 | |

**Dates**
Hire: 03/01/2006
Date 4: 08/21/2006
Birth: 04/18/1951

**PAY**
Gross: 1,075.00
Salary: 1000.00
Rate Calc: Weekly
3
LWW: 52   NWW: 205
Paid 12th of Month: 1,2,3
Prior Qtr Month 3
D — Standard 5th
— 75.00

**TAX STATUS**
Marital Status: S-SINGLE
Federal:
00 Exemptions
01 NY
19 NY SUI/DI

**SCHEDULED AMOUNTS**
26.56   E AFLAC        7.000%/88  401K%
        Direct Deposits   Code   C
Acct 1:  79385644              Full Deposit
Tran/ABA: 021000021

**ACCUMULATIONS TO DATE**

| | | |
|---|---|---|
| 127,735.08 Y Gross | 29,926.39 Q Gross | |
| 14,982.11 Y FIT | 3,299.52 Q FIT | |
| 6,324.00 Y SS | 328.99 Q SS | |
| 1,680.97 Y MED | 428.91 Q MED | |
| 4,387.71 Y State 1 | 901.56 Q State 1 | |
| 31.20 Y SUI/DI | 7.20 Q SUI/DI | |
| 8,123.65 Y 401K | 1,902.61 Q 401K | |
| 4,367.83 Ac 03 LOAN | 4,212.97 Ac 05 MISC | |
| 346.56 Ac 16 AFLAC | 1,461.56 Ac 17 AFLAC | |
| 116,051.96 Ac 20 ELIGI | | |

**FILARDO, DOUGLAS**
44 SOUTH FOURTH ST
LOCUST VALLEY, NY 11560

File: 000053
Dept: 100
Clock: XN50B
SSN: XXX-XX-6084

Status: ACTIVE
Sex: M

Dates
Hire: 03/01/2006
Date 4: 03/21/2006
Birth: 04/18/1951

**'S** 350.00 Ac: 33 VACAT

Gross: 1,000.00
Salary: 1000.00
Weekly
Rate Calc: 3
LWW: 53 NWW: 327
Paid 12th of Month: 1,2,3
Prior Qtr Month 3

Marital Status: S-SINGLE
Federal:
00 Exemptions
01 NY
19 NY SUJ/DI
3305 Local
NY METRO - M

26.66   E AFLAC
— Calc Factors —
015.0000  88  401K%
— Direct Deposits —
Acct 1: XXXXX5644       Code  C
Tran/ABA: XXXXXXXX X    Full Deposit

230.35 Ac: 26 DENTA
48,104.89 Ac: 20 ELIGI

| | | Q Gross | 34,080.04 |
|---|---|---|---|
| 144,460.01 | Y Gross | Q FIT | 2,443.13 |
| 12,094.91 | Y FIT | Q SS | 0.00 |
| 6,621.60 | Y SS | Q MED | 488.75 |
| 2,074.18 | Y MED | Q Side 1 | 657.09 |
| 3,982.36 | Y Side 1 | Q SUJ/DI | 7.80 |
| 31.20 | Y SUJ/DI | Q NYMCT TX9 | 33,706.60 |
| 33,706.60 | Y NYMCT TX9 | Q NYMCT TAX | 114.59 |
| 114.59 | Y NYMCT TAX | Q 401K | 5,112.01 |
| 19,342.64 | Y 401K | Ac: 05 MISC | 373.24 |
| 4,500.00 | Y 05 MISC | Ac: 16 AFLAC | |
| | | NW Y | |

**STAR AUTO SALES**
Company Code:  JDJ

Master Control  JDJ

Batch: 7103-040
Service Center: 040

Period Ending: 12/25/2009  Week: 53
Pay Date: 12/31/2009  Page: 4

ADP